## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

RODNEY LYLE,                             *

     Plaintiff,                        *

v.                                       *    Civil Action No: WDQ-02-2075

ZONE ENTERPRISES OF                      *
MARYLAND, L.L.C.,
                                         *
     Defendant.                        *

\*      \*      \*      \*      \*                \*      \*      \*      \*      \*

### DEFENDANT ZONE ENTERPRISES OF MARYLAND, L.L.C.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Zone Enterprises of Maryland, L.L.C., t/a ESPN Zone, has moved, pursuant to Fed. Rule Civ. P. 56, for summary judgment as to Plaintiff Rodney Lyle's singular claim for sexual harassment under Title VII of the Civil Rights Act of 1964, as amended, as there is no dispute as to any material facts and Defendant is entitled to judgment as a matter of law. This memorandum is submitted in support of Defendant's motion.

### STATEMENT OF THE CASE

Lyle has brought this action against his former employer, ESPN Zone ("ESPN" or "the Company"), asserting a single claim of sexual harassment arising out of the alleged conduct of one of his former co-workers, Angela Anderson.

The allegedly offensive conduct which forms the basis of Lyle's Complaint consists of a brief episode in which Lyle was allegedly teased by Anderson and other co-workers over his

personal view of a particular sexual act.  Shortly afterwards, Anderson was eating candy in the kitchen when Lyle asked her for a piece of the candy.  Anderson allegedly grabbed Lyle by the face, kissed him and pushed the candy into Lyle's mouth.  Lyle claims he reported the incident and, thereafter, Anderson never again physically touched him.  Although Lyle claims that, thereafter, Anderson still continued her sexual comments to him, he did nothing to report her conduct.  In January 2001, Lyle was overheard by management calling Anderson a "bitch."  When asked to come into the office her refused, and quit his employment.

As he did with his two prior employers, Lyle filed a charge of discrimination against ESPN with the Maryland Commission on Human Relations.  The MCHR dismissed his charge with a No Probable Cause finding.  Lyle, who was part-time, also filed a claim for allegedly unpaid vacation benefits which were, per Company policy, only paid to full-time employees.  This claim was likewise dismissed.

## BACKGROUND

Defendant ESPN owns and operates ESPN Zone, a sports themed restaurant and entertainment establishment located in Baltimore's Inner Harbor.[1]

### ESPN's Sexual Harassment Policy

ESPN maintains a clear policy against sexual harassment and it regularly communicates that policy to its employees through a handbook, training and posters.  The policy defines the procedure for the handling of sexual harassment, specifically requiring that "Employees who

believe that they have been harassed should promptly report the facts of the incident and the name of the person involved to the Human Resources or Equal Opportunity Program Departments." Lyle Ex. 9.

The Company's sexual harassment policy is also displayed prominently on a poster in the employee break room. Bey Dep. 66; Bey Ex. 2. The poster not only reiterates the company's prohibition of sexual harassment, but also provides information on making complaints, including a toll free phone number to call. Bey Dep. 66; Bey Ex. 2. In addition, employees of ESPN are given periodic training classes on sexual harassment called, "Working With Integrity," in which the Company policy is explained. *Defendant's Answers to Plaintiff's Interrogatories, Answer No. 7.* Ramina Adolemaiu-Bey ("Bey"), one of Lyle's co-workers at ESPN from April 2000 onwards, attended two of these sessions and Lyle admitted to having attended one, albeit allegedly in January 2001, shortly before he quit. Lyle Dep. 155; Bey Dep. 71.

Lyle's Employment

Plaintiff Lyle was hired by ESPN as a full-time Line Cook II, at the rate for $10 per hour, at the end of December 1998. Lyle Dep. 53-54. *Defendant's Answers to Plaintiff's Interrogatories*, Answer No. 14. He became a Line Cook in May 1999, with an increase in pay to $11 per hour. *Id.*; Lyle Dep. 75-76. In March 2000, Lyle's status was changed to part-time after a review of his hours over the preceding eight months showed his hours averaging below the 30 hours

---

[1] Deposition Excerpts and Exhibits, as well as written discovery responses and documents identified herein, are attached hereto. References to deposition pages or deposition exhibits cite the name of the deponent and

required to remain full-time.  As a part-time employee, Lyle was no longer eligible for vacation, sick or holiday pay.  Lyle Ex. 13.[2]

In early July 2000, Lyle was promoted to the position of Line Lead  Cook, a step above the line cook position, with a commensurate increase in pay to $12.50 per hour. *Id*.  Lyle added that his duties were essential those of a sous chef in training, Lyle Dep. 79, and that he was responsible for supervising a shift of 20-30 people.  Lyle Dep. 80-81.

Following his promotion, Lyle received a series of disciplinary warnings relating largely to his ability to follow instructions and procedures as well as arriving on time for work.  On July 17, 2000, for example, Lyle received a verbal warning because he did not show for a scheduled inventory.  *Defendant's Response to MCHR Charge, Ex. D*.  According to Lyle, Mark Gillenwalters, the Chef, tried to change his schedule to require early morning inventory.  Lyle protested to the General Manager, claiming that he could not make it to work at 5:30 a.m. twice a month because he lived at the end of the bus line.  Lyle Dep. 83-84.  Notwithstanding his initial protest, Gillenwalters scheduled Lyle for inventory again at the beginning of August.  Lyle Dep. 90.  When Lyle failed to appear, Gillenwalters gave him a written warning.  Lyle Ex. 12; Lyle Dep. 90.[3]  Lyle considered this discipline as well as Gillenwalter's habit of

---

corresponding page number of the deposition or exhibit, e.g., "Lyle Dep. ____" or "Lyle Ex. ____."

[2]  While Lyle claims he never received this notice, he cannot and does not dispute that he did not meet the eligibility requirements for a full-time employee.  Lyle Dep. 99.

[3]  The discipline also noted that Lyle continued to "struggle in following procedure, i.e. incomplete daily packets inaccurately filing daily sales sheets."  Lyle Ex. 12.  Similar issues were noted by Gillenwalters in a verbal warning on August 4.  *Defendant's Response to MCHR, Ex. D* ("Have grown concerned about Rodney's understanding of what is expected of him while he is learning his team leader roll [sic].")

repeatedly sending him home early to be retaliation for Lyle's earlier complaint to the General

Manager.  Lyle Dep. 82, 91-92.

By September 22, Lyle had received a final written warning as a result of his failure to

follow proper call out procedures.  Lyle Ex. 12.  Lyle claims he called and left a message, as it

was early in the morning and he was with his daughter at the hospital.  Lyle Dep. 93.

Nevertheless, Gillenwalters gave him the write-up.  Lyle Dep. 94.

The Alleged Harassment

By Lyle's own account, the alleged harassment began in "late July" 2000 – "right around

the time I got my promotion."  Lyle Dep. 101.  The person who allegedly harassed Lyle was a

line cook named Angela Anderson, more commonly known by her nickname "Buddha."  Lyle

Dep. 101-102.

Anderson was working with Lyle well before this date, and testimony offered by Lyle

and a Bey, makes clear that she spoke freely about her own sex life and engaged in sexual

banter and sex related conduct with other co-workers.   Lyle Dep. 103-106; Bey Dep. 10-11.[4]

She also tickled and poked other employees, and slapped female employees on the "butt."

Bey Dep. 12-14.  Both the male and female co-workers had discussions regarding various

forms of sex, and their personal sex lives.   According to Lyle, "the other guys enjoyed it. …

[and] played along."   So did, according to Bey and Lyle, certain female co-workers.  Lyle

---

[4]  According to Bey, she also observed "explicit sexual conversations and a lot of touching.  Touching and
hugging."  Bey Dep. 11.  She also observed "poking, touching or ticking" by Anderson "maybe once a week or --
or more, maybe a couple times more than once a week, to various guys including Rodney Lyle."  None of this
alleged  touching forms the basis of Lyle's harassment claim.

Dep. 105; Bey Dep. *96*.  As Lyle noted: "<u>She would say that to anybody.  It didn't make a difference with her</u>."  Lyle Dep. 106 (emphasis supplied).[5]

What apparently made the difference in late July was that Anderson and other co-workers apparently began to tease Lyle over the course of a week about his not having oral sex with his girlfriend, a practice he found "hideous."  Lyle Dep. 101, 169; Bey Dep. 18-19.  As described by Lyle, "[Anderson] would just make off-the-cuff comments about oral sex, how sexy my lips were, what type of activity that did me and my girlfriend do in our bedroom."  Lyle Dep. 101.[6]  Although alleged upset by the remarks, he made no effort to contact Human Resources, or even complain to his manager.  Instead, Lyle testified:

> "I would tell her things like Buddha, I don't do that, or Buddha, I'm not into that.
> And that's when she would bring other people involved, she would call Cristine
> or Coretha and say hey, he says he doesn't do this or doesn't do that, I couldn't
> be with a man who doesn't do that."

Lyle Dep. 105.

What Lyle characterized as the "final incident," occurred a few weeks later.  Lyle Dep. 106.  In "mid-August 2000," Anderson was passing by Lyle eating a piece of candy.  Lyle called out to her "hey Buddha, give me a piece of candy."  *Id.*  When Lyle turned to receive the candy, Anderson allegedly grabbed the sides of his face and forced the candy into his mouth with an unexpected kiss.  Lyle Dep. 106.  Lyle claims he spat out the candy, vomited, and then

---

[5]  Although both Lyle and Bey noted that the managers were aware of the sexual banter, Bey noted that they were careful to ensure that the conduct remained within proper bounds:  "And it seemed to me that they have accepted some of the talk as long as it doesn't get too far or doesn't offend anybody, it's all right."  Bey Dep. 109.

immediately reported the incident to the sous chef, Tara Gardner.  According to Lyle, Gardner said she would speak to Gillenwalters.  Lyle Dep. 110.[7]

Approximately two weeks after the incident, Lyle claims he was pulled into a meeting with Gardner and Gillenwalters and asked what his problem was with Anderson.  Lyle Dep. 113.   Although he claims he tried to verbalize his complaint "a second time," Gillenwalters cut him off with a rebuke. According to Lyle, Gillenwalters said "no, I'm not trying to play the victim, he don't like people that try to play the victim.  I made you a supervisor, if you can't handle it, I'll find somebody else that will.  You need to get some fucking balls to stand up to these folks around here or else you're not going to be a supervisor in my kitchen."  Lyle Dep. 111.

Following the candy incident, Anderson never physically touched Lyle again.  Lyle Dep. 114.  Yet, according to Lyle, she continued to make "sexual comments every day, every morning," such as "Oh, look at your lips, I could do things with those lips, Come eat my pussy, I'm opened, I'm closed."  Lyle Dep. 114-115.  Despite the fact that there was a Human Resources manager on the premises, Lyle never reported the alleged conduct.  Lyle Dep. 161.

On January 21, five months following the alleged candy incident, Lyle got into a verbal exchange with Anderson over her newspaper, which was sitting on the counter.  Anderson allegedly told him to put down her "motherfucking paper."  Lyle threw it on the table,

---

[6]  Bey described Anderson and other employees' conduct as "teasing Rodney about his sexual habits, his personal sexual habits," and said the conduct "went on for days."  Bey Dep. 18-19

[7]  Lyle also allegedly mentioned the incident and Anderson's subsequent conduct to Devon Thompson, another sous chef.  Lyle Dep. 115-116.

prompting Anderson to call him a "bitch-assed nigger."   While Lyle admits that he called

Anderson a "bitch," he denied using the "N word" in response.   Lyle Dep. 119.  His comments

were overheard by Gardner, who promptly directed him to come in to the office.  Lyle flatly

refused.  Lyle Dep. 120.

     Lyle claims that "true to form," he was sent home early that day, but that he reported

for work the next day.  Rather than go immediately to the kitchen, however, Lyle went to

Human Resources to press his continuing demand for benefits and vacation time.  Lyle

Dep. 123.  When he was told that he was not entitled to the claimed benefits because he was

not a full-time employee, he complained to Gardner and walked off the job:

> "I went back downstairs and told my chef, I said you know what, I've been
> dealing with all this stuff from Buddha and on top of that I'm not getting my
> benefits or vacation time, I'm being sent home on a regular basis early, I said I'm
> going to leave, I no longer want to work here."

Lyle Dep. 124.

     Lyle filed a charge of discrimination with the Maryland Commission on Human

Relations ("MCHR") a little more than a month later.  Lyle Ex. 16.  He also filed a complaint

with the Maryland Department of Labor Licensing and Regulation ("DLLR") protesting the

denial of vacation benefits.  Both agencies investigated the claims and both agencies issued

written decisions finding no merit to Lyle's allegations.  Lyle Exs. 15, 17.

     Lyle submitted a written protest of the MCHR's dismissal challenging the extent of the

MCHR's investigation and claiming that ESPN engaged in a cover up.  Lyle Ex. 18.  His

request for reconsideration was denied, and a notice of right to sue issued on February 20, 2002, Lyle Ex. 20, and this action promptly followed.

## ARGUMENT

### I.   Legal Standard

#### A. Summary Judgment

Summary Judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Moreover, summary judgment is mandated where, after full time for discovery, a party fails to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2549, 2552-53 (1986).  To overcome a motion for summary judgment, the non-moving party "must produce 'specific facts showing that there is a genuine issue for trial,' rather than resting on the bald assertions for his pleadings."  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).  "A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely."  *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984).

#### B. Sexual Harassment

To establish a hostile work environment, claim,  Plaintiff has the burden to prove that: (1) he was harassed because of her sex; (2) the harassment was unwelcome; (3) it was sufficiently severe or pervasive as to create an abusive work environment; and (4) that some basis exists for imputing liability to ESPN.  *Mikels v. City of Durham*, 183 F.3d 323 (4th Cir. 1999);

*Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *Hartsell v. Duplex Products, Inc.* 123 F.3d 766, 772 (4th Cir. 1997); *Thomas v. BET Soundstage Restaurant, Inc.*, 104 F.Supp. 558, 561 (D.Md. 2000). The mere use of sexually explicit words or conduct between men and women, however, does not automatically establish discrimination because of sex. O*cheltree v. Scollon Productions, Incorporated*, 308 F.3d 351, 356 (4th Cir. 2002) (*citing Oncale v. Sundowner Offshore Services,* 523 U.S. 75, 80).

A plaintiff must also produce evidence to establish that the alleged harassing behavior was based on sex and was so severe and pervasive as to create an objectively hostile or abusive work environment. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Not all harassment that is directed at an individual because of sex is actionable. *Lissau v. Southern Food Service, Inc.*, 159 F.3d 177, 183 (4th Cir. 1998); *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 753 (4th Cir. 1996), cert. denied, 519 U.S. 818 (1996).

Title VII was not intended as a vehicle to "purge the workplace of vulgarity." Id. Rather, harassment is only actionable if it is sufficiently severe or pervasive enough to alter the conditions of employment and create an abusive and hostile work environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). In determining whether harassment is actionable, the Court must examine "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hopkins*, 77 F.3d at 753 (*quoting Harris v. Forklift Systems*, 510 U.S. 17, 22 (1993)).

Moreover, the standard for employer liability for sexual harassment depends upon the alleged harasser's status as a supervisor or co-worker of the plaintiff. When the alleged harasser is a co-worker of the plaintiff, rather than a supervisor, the employer may only be liable for any allegedly harassing acts where it knew or should have known of such alleged harassment and failed to take prompt remedial action. *Mikels*, 183 F.3d at 332 ("For such 'unaided' harassment, by whomever done, employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it.")(*quoting Ellerth*, 118 S.Ct. at 2267).

The undisputed facts in the present case establish not only that the alleged harasser Anderson was not Lyles' supervisor, but that she was actually his subordinate during the period of the alleged harassment. Moreover, the conduct allegedly attributed to Anderson does not establish that the alleged conduct was sufficiently severe or pervasive to establish a claim for a hostile work environment or that she in any way targeted Lyles because of his sex

## II.    Lyle has Failed to Demonstrate a Hostile Work Environment

By Lyle's own account, the alleged harassment by Anderson began in "late July" 2000 – "right around the time I got my promotion." Lyle Dep. 101. The promotion was to Lead Line Cook, a step above the cook position held by Anderson.[8] Lyle makes no claim for any alleged conduct by Anderson prior to this time. Yet, accepting the truth of the testimony of his

---

[8] Perhaps in an effort to avoid the uncomfortable issue of how as a supervisor could be harassed by a subordinate, Lyle claimed that Gillenwalters repeatedly told him he was not permitted to mention the fact of his promotion. Nevertheless, his pay was automatically increased, and he was, in fact, provided with the white jacket worn by supervisory employees in August 2000, albeit allegedly after the candy incident. Lyle 109, 169-170.

witness Bey, Anderson routinely engaged in frank sexual banter with Lyle and other

employees, male and female, well before the alleged harassment began.  Bey Dep. 73.

The "final incident," according to Lyle, occurred a few weeks later, in "mid-August

2000" when Anderson forced the candy into his mouth with an unexpected kiss.  Lyle

Dep. 106.  Lyle claims he immediately reported the incident to Gardner, who said she would

speak to Gillenwalters.  Lyle Dep. 110.  Thereafter, although Anderson purportedly continued

to make "sexual comments" to Lyle every morning," "everybody just basically left [Lyle]

alone."  Lyle Dep. 113-114.

What appears to have made the difference in late July was that Anderson and other co-

workers apparently teased Lyle over the course of a week about oral sex with his girlfriend, a

practice he found "hideous."  Lyle Dep. 101, 169; Bey Dep. 18-19.  As described by Lyle,

"[Anderson] would just make off-the-cuff comments about oral sex, how sexy my lips were,

what type of activity that did me and my girlfriend do in our bedroom."  Lyle Dep. 101.

Although allegedly upset by the remarks, he made no effort to make a complaint per

Company procedures, or even complain to his manager.  Instead, Lyle testified:

> "I would tell her things like Buddha, I don't do that, or Buddha, I'm not into that.
> And that's when she would bring other people involved, she would call Cristine
> or Coretha and say hey, he says he doesn't do this or doesn't do that, I couldn't
> be with a man who doesn't do that."

Lyle Dep. 105.

But Lyle's efforts to paint himself as a victim of discriminatory conduct ring hollow, as

there is nothing in the record to support the conclusion that Anderson directed her comments

or conduct at him (or him exclusively) because of his sex.  Rather, the record, even when read

in a light most favorably toward the Plaintiff, reveals that the comments concerning oral sex

directed at Lyle were due not to his gender, but to his personal feelings about the sexual act.[9]

Such conduct may well be offensive, but it does not fall within the proscriptions of Title VII.

*See Ocheltree*, 308 F.3d at 356, *citing Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 749 (4th

Cir. 1996) ("Title VII does not reach discrimination based on other reasons, such as the

employee's sexual behavior, prudery or vulnerability.").  *See also McWilliams v. Fairfax Co. Bd.*

*Of Supervisors*, 72 F.3d 1191, 1196 (4th cir. 1996).

 Moreover, the record shows that Anderson spoke freely about her own sex life and

engaged in sexual banter with other employees.  Both the male and female co-workers had

discussions regarding various forms of sex, and their personal sex lives.  Bey Dep. 22.

According to Lyle, "the other guys enjoyed it. … [and] played along," Lyle Dep. 103, as did,

according to Bey and Lyle, certain female co-workers.  Lyle Dep. 105; Bey Dep. 96.  Anderson's

vulgar comments, therefore, particularly viewed in the present context, are not so

unambiguous so as to permit a reasonable assumption that the comments were motivated by

gender bias.  *See Ocheltree*, 308 F.3d at 358 (vulgarities including "faggot", "d--khead", "p-ssy",

"blow job" and "ass" not unambiguous gender related epithets sufficient to give rise to

reasonable inference of gender bias).

---

[9] Thus, her openness on sexual matters, which was manifest well before Lyle was promoted, was not offensive to
Lyle until she asked him about oral sex.  Bey Dep. 18-20.  When he answered candidly, Anderson and other
employees allegedly began to tease him.  *Id.*

Anderson also did not reserve her comments or her alleged physical conduct for the male employees.  Lyle testified, for example, that Anderson invited him to "eat [her] pussy," had the habit of throwing her leg on the kitchen counter and, while walking, say "I'm open, I'm closed."  Lyle Dep. 105.  Yet when asked whether she engaged in such acts with other male employees, he responded:  "She would say that to anybody.  It didn't make a difference with her."  Lyle Dep. 106 (emphasis supplied).  Likewise her physical contact – in the form of hugging, touching, tickling poking – was directed equally at men and women.  Bey Dep. 13, 15.  She also slapped some female employees on the "butt."  Bey Dep. 15-16.

Placed in its proper context, therefore, Anderson's kiss, even if assumed to be gender based, is so isolated that it can no more establish a sexually hostile work environment than the alleged vulgar banter.[10]  *Ocheltree*, 308 F.3d at 359.  This is particularly so given that Anderson never touched Lyle again after he allegedly complained to Gardner, and given the lack of any evidence that Anderson's alleged comments after that date in any way interfered with Lyle's ability to perform his job.[11]  *Id.*, at 369-370, *citing Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367 (1993) (Ginsberg, J. concurring) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms and conditions of employment to which members of the other sex are not exposed.").  In fact, Lyle continued as

---

[10]  The record is at best ambiguous as to Anderson's motivation for putting the candy into Lyle's mouth by kissing him.  Anderson's actions were precipitated by Lyle asking her for a piece of candy – candy which he knew she was eating, Lyle 106, and her response seems more related to her habit of teasing Lyle, than any sexual motivation.

[11]  During the August- September time period, Lyle received four warnings related to his inability to follow proper procedures, including reporting absences, reporting at the proper time, and attending to the details required of his Team Leader position.  *Defendant's Response to MCHR, Ex. D*.

Lead Line Cook without further incident, despite several early warnings regarding his ability to meet the responsibilities of his new position.  He ultimately quit not because of any immediate sexually harassing conduct by Anderson, but because he got in a fight with Anderson over her newspaper and was overheard calling her a "Bitch."[12]

In sum, Lyle has not produced sufficient evidence to establish that he was subjected to hostile work environment because of his sex or that the alleged conduct in any way interfered with his job performance.  Accordingly, his claim of sex discrimination under Title VII must fail.

### III.    Lyle Cannot Demonstrate that ESPN was Negligent

The present case is unusual in that the Plaintiff is claiming sexual harassment by an employee over whom he had some supervisory authority.  Nevertheless, accepting Lyle's testimony in the light most favorable to him, this case presents at most, as one of "co-worker" harassment.  In such a case, an employer may only be liable for the allegedly harassing acts of a co-employee where it knew or should have known of such alleged harassment and failed to take prompt remedial action.  *Mikels*, 183 F.3d at 332.  This standard differs from the affirmative defense provided to an employer in a supervisory situation in that, at all times, the plaintiff bears the burden of proof as to the propriety of the employer's response, and the employer has no corresponding burden of persuasion.  *See Swinton v. Potomac Corp.*, 270 F.3d 794, 803-04 (9th Cir. 2001).   In order to avoid judgment on his claim, the employee must either

---

[12]  Lyle also was upset that he was not eligible for  vacation benefits, and that Gillenwalters and Gardner were sending him home early, when the kitchen was overstaffed.  Lyle Dep. 124.  Neither problem had anything to do

demonstrate either that "the employer provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  *Id.* at 803.

In the present case, there can be no serious dispute that ESPN established a clear sexual harassment policy and regularly communicated that policy to its employees.  ESPN has a defined procedure for the handling of sexual harassment complaints set forth in its employee handbook.  Lyle Ex. 9.  Specifically, the policy requires that "Employees who believe that they have been harassed should promptly report the facts of the incident and the name of the person involved to the Human Resources or Equal Opportunity Program Departments."  *Id.*[13]

The Company's sexual harassment policy was also displayed on a poster in the employee break room.  Bey Dep. 66.  The poster not only reiterated the company's prohibition of sexual harassment, but also provided information on making complaints, and provided employees with a phone number to call.  Bey Dep. 66; Bey Ex. 2.  In addition, employees of ESPN were given periodic training on sexual harassment issues and to emphasize the Company policy.  Bey attended two of these sessions and Lyle admitted to having attended one, although he conveniently recalled it being in January 2001, shortly before he quit.  Lyle Dep. 155; Bey Dep. 71.  There can be no dispute, therefore, that ESPN provided its employees with an avenue for pursuing complaints.

---

with Anderson's alleged harassment.

[13]  Lyle denies having any knowledge of the policy before his training in January 2001, fully two years after he began his employment.  Lyle Dep. 155.  He also specifically denies ever receiving a copy of the Employee Handbook, Lyle Dep. 155, despite the existence of an acknowledgement of receipt of the handbook signed by Lyle at the time he began his employment with ESPN.  Lyle Ex. 10.  Lyle's specious denials, however, cannot negate the plain and simple fact that the Company had a clear and well articulated sexual harassment policy.  That he

There is also no compelling probative evidence that the Company had knowledge of Anderson's allegedly harassing conduct, particularly the claimed "daily" comments which followed the incident with the candy.   Accepting his testimony, Lyle complained about the candy incident, to Gardner, and again, shortly thereafter, to the sous chef, Devon Thompson. Lyle Dep. 115.  After that complaint, Anderson never again touched Lyle.

While Lyle contends that the harassment continued unabated up until the time of his termination, the only allegedly harassing conduct that continued after that date, according to Lyle, were daily sexual comments by Anderson, similar to those made prior to the candy incident.  Yet, there no evidence that he complained to anyone about the continuing comments.  Indeed, despite his trips to Human Resources to complain about his eligibility for vacation pay, Lyle never once mentioned these comments to Human Resources or other management.  Lyle Dep. 116, 123, 161.[14]  ("Why would I go back it [sic] to them and try to get them to help me when I've already been shown in the past they're not going to help me?  Why go to Human Resources and go over Gilly's head when I did that on one occasion before and I got creamed for it.").  See also Bey Dep. 106-107.

The only remaining evidence Lyle can muster to demonstrate the Company's knowledge of Anderson's alleged conduct is his general claim that the managers in the kitchen

chose to claim ignorance of the policy or ignore its existence is irrelevant to determining whether he has met his burden in proving the Company was negligent.

[14]  Lyle tries to excuse his failure to go to Human Resources by contending that he feared the "hammer" of Gillenwalters, because Gillenwalters had previously retaliated against him for protesting disciple regarding his failure to appear for morning inventory.  Lyle Dep. 161.  Case law makes clear, however, that such excuses do not forgive the legal obligation of an employee to report improper conduct.  *Matvia v. Bald Head Island Management*,

were aware of the sexual comments and conduct engaged in by Anderson and others.  Such awareness, however, does not readily translate into knowledge of and refusal to deal with a sexually hostile work environment.  In fact, Bey's testimony compels exactly the opposite conclusion.

When pressed regarding her statement that the managers were aware of the sexual talk, and even participated at times, she added that they were careful to ensure that the conduct remained within proper bounds:  "And it seemed to me that they have accepted some of the talk as long as it doesn't get too far or doesn't offend anybody, it's all right."  Bey Dep. 109. See also Bey Dep. 111-112.  In fact, although she was versed in the Company's sexual harassment policy, Bey never once lodged a complaint regarding the alleged conduct in the kitchen.  Bey Dep. 111.  The only incident of sexual harassment which she could recall occurred not in the kitchen, but the dining area, and she testified that the manager responded immediately to a problem.  Bey Dep. 96-98.

Thus, far from demonstrating that ESPN knew of and failed to take action with respect to sexually harassing conduct, Bey's testimony shows that ESPN was responsive to real and potential problems.  The fact that the managers may have been aware of sexually explicit talk does not reasonably permit the conclusion that they knew of the alleged sexual harassment, no more than such conduct can establish, without more, a sexually hostile work environment.

---

259 F.3d 261, 269 (4th cir. 2001) ("the victim of sexual harassment has a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of the statute.")

Accordingly, Lyle is unable to demonstrate that ESPN either knew of or failed to take prompt remedial action with respect to the alleged harassment, his claim must fail.

**IV.    Lyle Has No Valid Claim for Backpay**

Lyle's Complaint pleads a single count alleging sexual harassment, for which he seeks damages for resulting humiliation and emotional distress. *Complaint* ¶12. Nowhere does he allege that he was constructively discharged from his employment. Yet, despite that omission, Lyle appears to claim damages to replace wages lost during the time period from when he quit his employment until he was able to locate another job. *Plaintiff's Answers to Interrogatories*, Answer No. 5, Lyle Ex. 22. As Title VII does not permit recovery of such damages absent an actual or constructive discharge, Lyle should be foreclosed from recovering this back pay and any other related compensatory damages. *Von Gunten v. Maryland Department of the Environment*, 68 F.Supp.2d 654 (D. Md. 1999); *Hofherr v. Vista Irrigation District*, 2000 U.S. App. LEXIS 11823 (9th Cir. 2000) ("an employee cannot quit and sue for post-resignation damages without showing constructive discharge").

As the record is clear that Lyle voluntarily left his job at ESPN, the only basis on which Lyle may make even a colorable claim to back pay and other related post-termination damages is to prove that he was constructively discharged.[15] In order to demonstrate a constructive discharge, however, Lyle must show that ESPN "deliberately made [his] working conditions

---

[15]    The Fourth Circuit has deviated from this rule only in the most compelling circumstances. Thus, in *Wells v. North Carolina Board of Alcoholic Control*, 714 F.2d 340 (4th Cir. 1983), the Fourth Circuit permitted recovery of lost wages where the plaintiff's physician instructed him to take a leave of absence due to a back condition exacerbated by his heavy lifting duties. The plaintiff, however, had previously been discriminatorily denied a

'intolerable' in an effort to induce [him] to quit." *Von Gunten*, at 661.  It is not enough for Lyle to simply allege that he was subject to continuing harassment.  Rather, Lyle must demonstrate that the working conditions were sufficiently intolerable that a reasonable person in Lyle's position would have felt compelled to resign.  No such evidence is presented here.

On January 21, 2001, five months following the alleged candy incident, Lyle got into a verbal exchange with Anderson over her newspaper and was overheard calling her a "bitch." Lyle Dep. 119.  Gardner directed him to come into her office, and he flatly refused.  Lyle Dep. 120.  Although Lyle claims he was "true to form," sent home early, he now claims that he reported for work the next day.  Rather than report immediately to work, however, Lyle went to Human Resources.  Lyle Dep. 123.  He did so not to make any complaint about Anderson or the allegedly on-going harassment, but to press his continuing demand for benefits and vacation time.  *Id*.

When he was told that he was not entitled to the claimed benefits because he was not a full-time employee, he complained to Gardner and walked off the job:

> "I went back downstairs and told my chef, I said you know what, I've been dealing with all this stuff from Buddha and on top of that I'm not getting my benefits or vacation time, I'm being sent home on a regular basis early, I said I'm going to leave, I no longer want to work here."

Lyle Dep. 124.  Only the most strained reading of Lyle's testimony would allow an inference of constructive discharge.

---

promotion to light duty work.  The court found that the plaintiff ended his employment for reasons beyond his control and for reasons causally linked to the wrongful denial of promotion.

Lyle's claim to benefits and vacation time, for example, was a continuing battle throughout his employment, and was utterly unrelated to his allegations of sexual harassment. Lyle Dep. 95-98.[16]  Lyle Ex. 13.  He even ultimately filed a claim with the Maryland DLLR, which was ultimately dismissed.  Lyle Ex.  14.  While he now attempts to at least temporally connect his reduced hours with his complaints about Anderson, Lyle Dep. 100, in a letter to the MCHR, he suggested an entirely different motivation for ESPN's conduct:  "I feel as though this is a revenge trip for Mr. Gillenwalters and Ms. Gardner because on July 3rd, 2000 I submitted in writing a formal complaint of Mr. Gillenwalters forced attempt of a schedule change."  Lyle Ex. 18, Lyle Dep. 82-83, 92.[17]

The only remaining element of Lyle's unstated constructive discharge claim is the alleged harassment by Anderson.  Yet, as noted above, there is no compelling evidence that ESPN was even aware of the allegedly continuing coments after September 2000, let alone that ESPN deliberately acted (or failed to act) in order to force Lyle to quit his job.  Lyle made no effort to report the allegedly offensive conduct either to Gardner, Gillenwalter or to Human Resources.  The only reasonable conclusion that may be drawn from the record, therefore, is that Lyle quit in a pique after his argument with Anderson.

Indeed, the circumstances in the present case bear a marked similarity to Lyle's track record at his two prior places of employment.  At the Suburban Club of Baltimore, Lyle

---

[16]   In deposition, true to form, Lyle repeatedly denied any knowledge of the Company policy regarding part-time work and benefits.  Lyle Dep. 99.
[17]   Lyle was formally disciplined in August 2000 for failing to report for scheduled inventory despite agreeing to do so.  Lyle Ex. 12.

walked off the job after a heated argument with a white co-worker, leaving the shift short-handed.  Lyle Dep. 30-33; Lyle Ex 22.  Soon thereafter he filed a charge of race discrimination.[18] Lyle Ex. 1.  Lyle also filed a charge of discrimination against the Engineering Society based on alleged advances to him by a male subordinate.  Lyle Dep. 177.  Like his charge against ESPN, the charges against the Suburban Club Engineering Society were also dismissed as without merit.  Lyle Dep. 34-35, 178; Lyle Ex. 3.

To permit recovery of lost back wages and related damages under such circumstances would eviscerate the standards the courts have drawn for constructive discharge claims.  Accordingly, any claim that Lyle may make for such damages should be dismissed.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant Zone Enterprises respectfully requests that the Court grant its Motion for Summary Judgment and dismiss the Plaintiff's Complaint with prejudice.  Alternately, this Court should dismiss any claim for back pay.

Respectfully submitted,

_____/s/_____
Kevin C. McCormick
Melissa L. Menkel
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
(410) 347-8700
Counsel for Defendant
Zone Enterprises of Maryland, L.L.C.

---

[18]  Much like his present denials regarding ESPN's harassment policy, Lyle denied having discipline problems at the Suburban Club and denied ever receiving copies of the several written disciplinary warnings submitted to the MCHR by Suburban in response to his charge. Lyle Dep. 29-34; Lyle Ex. 2.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of June 2003, a copy of the foregoing

Defendant ESPN Zone's Motion for Summary Judgment, Memorandum in Support of Its

Motion for Summary Judgment, and proposed Order were served electronically and/or by

first class postage to:

> Morton Edelstein, Esquire
> Edelstein and Radford
> Suite 402
> 110 Saint Paul Street
> Baltimore, Maryland 21202
> (410) 685-0770
>
> Attorney for Plaintiff
> Rodney Lyle

_____/s/_____

Kevin C. McCormick

1496986